GUSTAV W. LEMBECK

*v.*

JARVIS TERMINAL COLD STORAGE COMPANY.

[Filed May 13th, 1905.]

Where a mortgagee of the property of a corporation released her mortgage in consideration of a promise to issue to her certain bonds of the company, and later, on the statement of a representative of the corporation that the bonds were not at that time available, accepted in lieu of bonds the company's stock, and retained it without objection for two years, during which time the corporation incurred debts to others on the faith of her not being a bondholder, she was estopped, on the corporation becoming insolvent before her objection was raised, to claim a priority over those who had extended credit to the corporation without knowledge of the transaction.

The main case was a proceeding under the Corporation act to have the defendant corporation declared insolvent, and to have an injunction issued against it and a receiver appointed for it.

The result of this suit was, among other things, the appointment of receivers on the 28th day of March, 1904.

The property of the defendant corporation was encumbered by mortgage and other liens, and was, by order of this court, dated May 23d, 1904, ordered to be sold by the receivers free and clear of all liens.

It was so sold, and by an order dated October 17th, 1904, it was ascertained and ordered that the net amount remaining in the hands of the receivers, namely $7,668.28, should be paid into this court, subject to the same liens and equities as before the sale.

On the 5th of December, 1904, Nathalie Jarvis filed her petition in this cause, praying that she might receive a portion of this money, and to that petition answers and cross-petitions have been filed by the Commercial Trust Company of New

Jersey, the trustee under one of the mortgages, by John Alvin Young and Richard Irvin, by the Union Terminal Cold Storage Company and by the Erie Railroad Company.

The case was heard upon the pleadings and proofs taken in open court.

*Messrs. Grey, McDermott & Enright* (with whom was *Mr. Benjamin F. Tuska* of the New York bar), for Nathalie Jarvis.

*Mr. William Brinkerhoff* and *Mr. Willard C. Fisk,* for the Commercial Trust Company of New Jersey.

*Mr. Pierre F. Cook* (with whom was *Mr. Alfred A. Wheat* of the New York bar), for John Alvin Young and Richard Irvin and the Union Terminal Cold Storage Company.

*Messrs. Collins & Corbin,* for the Erie Railroad Company.

GARRISON, V. C.

It will be necessary to state facts before it can· be made to appear what the issues are and what conclusion is reached respecting them.

The Jarvis Terminal Cold Storage Company was a corporation of this state organized on the 2d day of October, 1902.

It was promoted by Robert M. Jarvis. Prior to its incorporation he held an option upon land owned by Nathalie Jarvis, who was the widow of the nephew of Robert M. Jarvis. This option provided that he might purchase the property for $22,-500. After the incorporation of the company it took over this option and paid $8,000 in cash and gave a purchase-money mortgage to Nathalie Jarvis for $14,000, dated December 1st, 1902, due December 1st, 1903. It does not appear what became of the difference between this cash payment plus the mortgage and the $22,500 agreed to be paid.

All of Mrs. Jarvis' business, with this company at least, was transacted by a New York stockbroker named Samuel M. Schafer.

Almost immediately after the conveyance and mortgaging of this property, as above described, the company expressed its desire to have the property freed from the lien of her mortgage so that a trust mortgage might be placed upon this property to include the real estate of which it then consisted and the large storage plant to be erected thereon, this trust mortgage to be for $150,000.

In pursuance of this purpose Robert M. Jarvis, on behalf of the company, negotiated with Mr. Schafer, who acted for Mrs. Nathalie Jarvis. Mr. Schafer's testimony is that in these negotiations, which were held in January of 1903, he reached an agreement with Mr. Jarvis by which Schafer agreed that he would release or satisfy the mortgage held by Mrs. Jarvis upon the real estate for $14,000, of which $7,000 was to be paid in cash and the other $7,000 was to be represented by a note of the company at sixty days, secured by $7,000 of the bonds out of the contemplated issue of $150,000 of bonds to be secured by the trust mortgage before mentioned.

While the other parties to this proceeding seek to cast doubt upon this version of the agreement, there does not appear to be any good reason for refusing to believe the only testimony that there is in the case concerning it.

The bargain, as stated above, was testified to by Samuel M. Schafer, and is to some extent corroborated by his son's testimony and by letters of Robert M. Jarvis written to Mr. Schafer after the date of the negotiations, the contents of which letters concern the terms of the negotiation.

This testimony was all given upon the first day of the trial of this suit and while Mr. Robert M. Jarvis was in the court-room. Subsequently Mr. Jarvis was sworn, was examined at length, left the stand, and, after other witnesses had been sworn, was recalled to the stand and examined again.

The court, upon Mr. Jarvis requesting leave to depart, stated that he should remain because it had been suggested by other counsel that they desired to call him.

After this and at the afternoon session, Mr. Jarvis returned and was again put upon the stand and examined.

At the close of the first day's session counsel announced that

all testimony was in excepting that of an officer of the United States Mortgage and Trust Company, whose testimony they desired to take the next morning, and this was agreed to.

The next morning this officer was produced and sworn, and after his testimony had been given, counsel for the Erie Railroad Company desired again to examine Mr. Jarvis, this time concerning the dealings with Mr. Schafer. At that time the petitioner had none of his witnesses present, and it seemed then, and seems now, to the court that it would have been unjust and improper to permit Mr. Jarvis to testify then, after the close of the case and in the absence of those whom the petitioner had had present to testify concerning this subject-matter. And this was especially so because the Erie Railroad Company had produced Mr. Jarvis as its own witness on the preceding day and had examined him. So that it is the fact that the testimony of Schafer and his son is uncontradicted.

These negotiations, which took place, as has been before stated, in January of 1903, culminated in the sending by Schafer to Mrs. Jarvis, who had gone to Europe, of a satisfaction piece of the mortgage, to be executed by her, and, upon the return of that instrument, his delivering the same to Mr. Jarvis.

There is no clear testimony as to when this delivery took place. It was either before the 19th day of February, 1903, or on that date.

On that date Mr. Jarvis delivered to Mr. Schafer, for Mrs. Jarvis, a note of $7,000, executed in the name of the company by Jarvis and his son, the president and treasurer of the company, payable in sixty days, and seventy shares of the capital stock of the company. The note recites that these seventy shares are deposited as collateral with it.

Mr. Schafer testifies that Mr. Jarvis explained to him that the bonds of the company were not yet available, and hence he could not deliver them as agreed, and that he delivered the stock as a temporary collateral.

This note was renewed as it became due from time to time through seven renewals. These renewals took place at intervals of sixty days up to August 19th, 1903, and thereafter at inter-

vals of thirty days, the last renewal note being dated November 23d, 1903.

No other collateral was ever substituted for the stock, and on the 8th day of June, 1904, there was filed with the receivers a claim on behalf of Mrs. Jarvis, sworn to by her, setting forth her claim. She states therein that

"Relying upon these representations, I consented to discharge said mortgage and to satisfy same of record, and to take in lieu thereof the sum of seven thousand dollars cash and a note of seven thousand dollars, dated February 19, 1903, payable in sixty days, and bearing interest at the rate of five per cent. per annum, with seventy shares of the stock of defendant as collateral, which note given with the said collateral I still hold, and no part of said note has been paid."

She thereon claimed to be preferred upon the ground that the representations were false, and that she was entitled to be paid before any other creditors excepting the bondholders, whose claims she admitted to the amount actually paid by them for their bonds.

As this claim was filed out of time, application was made to this court, and by order, dated July 18th, 1904, leave was given to her to file the claim as if within time.

The trust mortgage, of which mention has been made, was dated the 2d day of February, 1903, and was made by the Jarvis company to the Commercial Trust Company, as trustee; was for the amount of $150,000, securing one hundred and fifty bonds of $1,000 each; was proved on February 20th, 1903, and was recorded on the 21st day of February, 1903, at 11:59 A. M.

At exactly the same time and date there was also recorded the satisfaction piece executed by Nathalie Jarvis, as aforesaid, which was dated February 5th, 1903.

Under the provisions of the trust mortgage, $125,000 of bonds, or one hundred and twenty-five bonds, were to be executed, certified by the trustee and delivered to the company for the purpose of building the plant. This was done, and these bonds, as appears from the proofs, were taken by persons who had subscribed to them even before their authorization, and who paid for them at the rate of eighty-eight cents on the dollar.

Under this mortgage the remaining twenty-five bonds could

be used by the company for additions and extensions, and provision is made for a certain certificate to be executed by the company and sworn to and delivered to the trustee, who must then certify the bonds.

This was done about the 22d day of December, 1903, and these additional twenty-five bonds were issued and delivered to the company.

On the 16th of December, 1903, as a result of negotiations carried on between Mr. Jarvis for the company and representatives of the Erie Railroad Company, a mortgage was executed by the Jarvis company to the Erie Railroad Company for $16,500. This mortgage is made expressly subject to the trust mortgage of $150,000, whether all the bonds were at that time issued or not.

It appears that there were unsatisfied obligations of the Jarvis company arising out of its building and equipping its plant; that money was needed to pay these, and that it was computed how much would be required to pay the existing bills of this nature, and after it was ascertained that $16,500 was the amount required for this purpose, the Erie Railroad Company agreed to advance the money to pay these bills, provided it was secured by the mortgage in question.

The $25,000 of bonds, issued under the addition and extension clause as above described, were taken by Mr. Jarvis to the United States Mortgage and Trust Company of New York for the purpose, Mr. Jarvis says, of having that company either sell the same, buy them or make a loan upon them.

At that time the relations between the Jarvis company and the trust company were these: The trust company had advanced, on November 10th and November 20th, 1903, to the Jarvis company, in sums of $10,000 each, a total of $20,000. For this it had received a note of the Jarvis company for $20,000, dated November 10th, 1903, secured by the subscription agreement of those who had agreed to subscribe at par for stock of the Jarvis company.

All told, the United States Mortgage and Trust Company had received from the subscribers to stock the sum of $4,500, leaving $15,500 still due upon this note.

At the United States Mortgage and Trust Company, on the date in question, when Mr. Jarvis went there with the twenty-five bonds as aforesaid, he saw Mr. Cumming, the vice-president of the company. Mr. Jarvis testifies that he stated to Mr. Cumming the object of his visit and produced the bonds, and that Mr. Cumming said that he would submit the matter to his committee and let Mr. Jarvis know what the result was.

Subsequently Mr. Jarvis and Mr. Cumming met, and Mr. Cumming informed Mr. Jarvis that since Mr. Jarvis had sent to the trust company and gotten the subscription agreement (it appears for the purpose of having additional names subscribed), and had not returned it, that the trust company would keep the bonds as additional security to the loan.

Jarvis protested, but the company retained the bonds.

Some time after this, by agreement between Jarvis and the trust company, the latter surrendered five of these bonds to the Crane company, a creditor of the Jarvis company, which first-named company took them as collateral for its debt and afterwards sold the same at auction, after notice, and realized some $2,500 thereon.

Subsequently the executive committee of the Jarvis company —which committee consisted of Mr. Case, Mr. Bumsted and Mr. Jarvis—went to the office of the United States Mortgage and Trust Company and discussed the matter with Mr. Cumming. They protested against the right of the trust company to retain these bonds as additional security, and Mr. Case testifies that they agreed with the trust company to put up $12,500 of their stock with the trust company if that company would, in addition to what it had already advanced, advance sufficient money to enable the Jarvis company to pay its interest on the $125,000 of bonds. The trust company did so advance the money, and it was used to pay the interest due February 1st, 1904.

The total amount of overdraft, including the money used to pay this interest, was in the neighborhood of $4,600.

I think it clear that the net result of the various happenings with respect to these bonds was that it was understood and agreed that the trust company might keep the same as addi-

tional collateral to the existing indebtedness if it would advance the additional money needed for coupon interest. This it did, as heretofore stated.

The mortgage company retained the bonds down to the time that Young and Irvin acquired the same from it.

On the 28th of March, 1904, the proceedings in insolvency in this suit were commenced.

In May of that year the receivers reported to the court and requested leave to sell the property, and on the 23d of May, 1904, an order was made for the sale of the property free and clear of the liens. The liens, as at that time appeared, were the $150,000 trust mortgage, the $16,500 Erie railroad mortgage and nine mechanics' liens which had been filed against the property, aggregating $45,000.

In this order of May 23d there was a minimum limit placed upon the property of $190,000.

At the sale, no bid arising to the minimum limit being made, the receivers reported that fact to the court, and on the 20th of June, 1904, the receivers were ordered to sell as aforesaid without restriction as to price.

It was provided in the order of June 20th, 1904, that the purchaser must agree to pay of the purchase price at least $25,000 in cash, and that he might secure the payment of the balance by depositing with the receivers bonds and mechanics' liens to the amount stated in that order.

On the 26th of June, 1904, the sale was had, and the property was purchased by Daniel E. Cleary, Charles E. Cassidy and Gustav W. Lembeck, a committee of the bondholders, for $135,-000. This sale was confirmed by an order dated July 5th, 1904.

On the 26th of July, 1904, the purchasers deposited with the receivers $75,000 in bonds, and enough cash, together with that which they had already paid, to make $25,000 in cash.

On the 26th of August, 1904, John Alvin Young and Richard Irvin made an agreement with Cleary, Cassidy and Lembeck by which it was agreed that they should pay down $10,000—should thereafter pay $16,989.33 in cash and any excess of expenditures over receipts in the current running of the business, and also accrued interest on the bonds from February,

1904, to September 1st, 1904, and give in exchange, bond for bond, new bonds in the new company called the Union Terminal Cold Storage Company.

For this consideration the purchasers at the sale assigned their bid and the bonds deposited with the committee and all their rights in the premises.

On the 13th of September, 1904, Young and Irvin petitioned this court that a deed from the receivers might be made to the Union Terminal Cold Storage Company.

On the 19th of September, 1904, an order was made, consented to by all counsel present, among whom was counsel for Mrs. Jarvis. In this order it is recited that Young and Irvin· held all of the one hundred and fifty bonds and had assignments of all of the mechanics' claims and· liens aggregating $45,000, and that such bonds, liens and claims were valid and prior liens at least to the extent of the unpaid part of the purchase-money, namely, $110,000, and might be turned in as such payment.

On the 8th of October, 1904, the final report of the receivers was filed and an order to show cause granted. In this report the amount due upon the one hundred and twenty-five bonds sold for cash and the five pledged with the Crane company is adjudicated and determined to be $135,129.32. The receivers did not allow the claim on the twenty bonds held by the United States Mortgage and Trust Company.

With respect to the claim of Nathalie Jarvis, they adjudicate it to be a general unpreferred claim. No appeal was taken by her from this determination of the receivers.

On the 17th of October, 1904, a hearing was had at which counsel for Nathalie Jarvis was present, the final report was confirmed and certain payments were authorized to be made out of the moneys in hand and the balance ordered paid into court. It was ordered that nothing in the receivers' report or in this order should be deemed to be an adjudication or determination of the rights of the Commercial Trust Company, trustee, Young, Irvin, the Erie Railroad Company and Nathalie Jarvis in the balance, but that they have leave to apply by petition or otherwise to determine their rights in said fund.

It was not until after this, and on December 5th, 1904, in her petition with respect to the fund, that Mrs. Jarvis ever disclosed her claim to be a bondholder or to be considered as a bondholder.

The net amount deposited by the receivers under this order was, as has been before stated, $7,668.28.

Nathalie Jarvis claims that by reason of the negotiations between her agent, Schafer, and Jarvis, an agreement was reached that she should have, as collateral security for the $7,000 unpaid to her, seven of the bonds of this $150,000 issue, and that she is therefore entitled now to be considered as having seven of such bonds and to receive the *pro rata* distribution thereon.

The Erie Railroad Company, the holder of the second mortgage, can only succeed in its claim by diminishing the amount to be paid to the bondholders of the first mortgage.

The Union Terminal Cold Storage Company and Young and Irvin claim that they hold the whole $150,000 of these bonds, and also hold the mechanics' liens and claims, and that the money in court is insufficient to meet the prior lien of the bonds, even if only one hundred and thirty thereof are adjudged to be issued and outstanding. They therefore insist that Mrs. Jarvis, in view of the circumstances, is estopped now to claim, as against them, any rights as a bondholder.

There is no occasion for the citation of any authorities since the only principle involved is the thoroughly settled one of estoppel, and the sole question is whether the facts call for the application of that principle.

I find with respect to Mrs. Jarvis, that whatever may be the proper determination with regard to her claim that she was promised seven of the bonds, and even assuming that she might, by acting promptly, have compelled the company to issue the same to her, she is now estopped, as against the parties herein, to claim to be a bondholder to the extent of seven bonds, or to be treated as if she was such holder.

My reasons for this, briefly stated, are that the bargain, assuming it to be as she now insists it was, was made in February of 1903, and there is no pretence on her part that it was disclosed or stated or insisted upon by her until she filed the peti-

tion herein on the 5th of December, 1904. During that time, as has been stated more in detail above, the new issue of one hundred and fifty bonds was made, one hundred and twenty-five of such bonds were sold to subscribers, five of such bonds were placed with the Crane company and twenty with the United States Mortgage and Trust Company. These parties either had an absolute right to hold these bonds as collateral security for past advances or for future advances, or, in any event, were so situated with respect to them that they could and did retain possession of the bonds until they were satisfied in some way and were by some consideration induced to relinquish them. Mechanics' liens, aggregating $45,000, were filed against the real estate, and, either for their face or for little less than their face value, have been paid for and acquired by other parties.

The Erie Railroad Company advanced its money during this period.

The persons who bid at the sale and the reorganizers who purchased their bid and took their place had each the right, in any view, to be bound only by that which an examination of the proceedings would show.

Such an examination would show nothing with respect to the claim of Nathalie Jarvis to bonds. Her filed claim, dated June 6th, 1903, stated the bargain—that she was to have stock and took that as collateral for the money owed her by the company.

I think that the parties in interest had a right to rest secure, with respect to the existing encumbrances, upon anyone of various hypotheses, all of which were exclusive of Mrs. Jarvis as a bondholder.

They had a right either to assume that the only bondholders were those who held the $125,000 of bonds first issued; or those, plus the $5,000 pledged to the Crane company; or those, plus the $20,000 lodged with the United States Mortgage and Trust Company.

Since they advanced their money and irrevocably changed their position by purchasing all of these bonds, and by paying the mechanics' liens, and by getting rid of the obligations with the United States Mortgage and Trust Company and with Crane

& Company, I can see no equitable view which entitles Mrs. Jarvis after nearly two years of silence, to claim now that she was a bondholder or was entitled to be treated as such.

With Mrs. Jarvis' claim out of the way, there is no necessity for a specific holding as to the other parties. Because I find that the surplus in court is not sufficient to pay to Irvin and Young or the Union Terminal Cold Storage Company, whichever now owns the same, the prior liens due them.

The Erie Railroad Company can take nothing because the prior liens to it will not be paid in full, and there is therefore nothing to which its lien attaches.

Hence I find that the sum in court is payable to the Union Terminal Cold Storage Company, or to Young and Irvin, and that the other parties are without claim thereto, excepting the Commercial Trust Company. That company is entitled to be paid certain sums out of the fund as follows:

Eight hundred and fourteen dollars and twenty-five cents, the aggregate of insurance premiums paid by it as trustee on the mortgaged premises, with interest from the date of payment.

Three hundred dollars compensation for acting as trustee under the mortgage in accordance with the provision thereof allowing compensation.

One hundred and fifty dollars for certification of bonds, which is a prior lien under the mortgage.

Two hundred dollars for counsel fee paid by the trust company to its counsel, and made a prior lien in accordance with the terms of the mortgage.

I will advise a decree in accordance with these conclusions.